## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO
_____

**THOMAS L. WARD, SR.,**

     Plaintiff,

v.                                  No. CIV 99-1070 BB/WWD

**WAL-MART STORES, INC.**

     Defendant.


### OPINION AND ORDER

THIS MATTER comes before the Court on Defendant's Motion for Summary Judgment (Doc. 52), filed January 5, 2001.  The Court has reviewed the parties' submissions and the relevant authorities, and, for the reasons set forth below, finds that Defendant's motion should be GRANTED IN PART and DENIED IN PART.


### I.
### BACKGROUND

Plaintiff Thomas Ward brings this action pursuant to the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101 et. seq., based on his termination from Defendant Wal-Mart's distribution center in Los Lunas, New Mexico.  Ward alleges that he was terminated, in violation of the ADA, due to a permanent upper body disability which prevents him from lifting any object

above waist level.  In addition, Ward has filed retaliation claims under both the ADA and the Age

Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et. seq.[1]

     Plaintiff Ward was employed by Wal-Mart as a Loss Prevention Officer from October 16,

1998 to May 6, 1999.  The basic job function of a loss prevention officer is to prevent the theft or

loss of inventory from Wal-Mart's distribution center.  Approximately one-third of a loss

prevention officer's job is devoted to "truck gate" duty, in which the officer monitors incoming

and outgoing freight being brought into the distribution center through the truck gate.  As part of

his truck gate duties a loss prevention officer is required to check the trailers of outgoing trucks

to verify their contents, if any.  Inspecting the trucks necessitates lifting the rolling doors on the

back of the trailers:  the doors, which are spring-loaded, must be pulled up, lifted overhead, and

secured.

     Due to his former career as a mechanic in which he was required to lift extremely heavy

weights, Ward was diagnosed with adhesive capsulitis and chronic impingement syndrome in both

of his shoulders.  Following extensive shoulder surgery, Ward's surgeon issued permanent work

restrictions regarding his lifting ability.  Ward is permanently restricted from reaching overhead on

a regular repetitive basis and is permanently restricted from lifting overhead any object greater

---

[1]There was apparently some confusion as to whether Plaintiff attempted to pursue his age
discrimination claim, as alleged in his March, 1999 complaint to the Equal Employment
Opportunity Commission (EEOC), in the pending lawsuit.  Both parties have agreed that Plaintiff
does not bring an age discrimination claim and is suing solely under the retaliation provisions of
the ADEA.

than two pounds at any time.[2]  These upper body lifting restrictions prevent Ward from raising the trailer doors on the back of the freight trucks.

Ward contends that during his September, 1998 interview for the position of loss prevention officer, he informed his interviewer[3] he was unable to lift anything above waist level. Wal-Mart denies that Ward made anyone aware of his impairment at the time of the interview. What is clear, however, is that Ward was presented with a standard form, "Wal-Mart Distribution Centers Matrix of Essential Job Functions."  Attachment A to Plaintiff's Exhibit 1.  The matrix, which states that it "is intended solely to advise applicants who have disabilities of the essential functions as defined by the Americans with Disabilities Act (ADA)," is a table listing entry-level positions at Wal-Mart distribution centers and each position's corresponding essential functions. An "X" is marked under each essential function required of the position.  Two of the approximately twenty essential functions listed are "upper body mobility" and "lower body mobility."  Conspicuously, neither upper body mobility nor lower body mobility are marked as

---

[2]Specifically, Dr. Marxen's report reads as follows:

    1. [Mr. Ward]  is permanently restricted from reaching overhead on a regular repetitive basis.  He may do this on an occasional basis four times or less over a period of an hour and thirty-two times or less over an eight hour period.

    2. [Mr. Ward] is permanently restricted from lifting any object greater than two pounds overhead with either extremity at any time.  He is on no lifting restriction as long as his upper extremities are in a dependant position, i.e., if his elbows are basically at his side.  In other words, Mr. Ward may lift over one hundred pounds off the floor, fifty pounds with each upper extremity, as long as he is not required to lift this above waist level.

    [3]Mr. Ward later identified his interviewer as Michael Wright, a Quality Assurance Coach for Wal-Mart.

essential functions for the position of loss prevention officer.  The form is signed by Ward and dated the day of his interview.

During his first five months as a loss prevention officer, Ward encountered no situation in which he was required to lift the truck door overhead.  Ward began work in the fall of 1998, at which time Wal-Mart was in the process of completing the distribution center; products were first shipped from the distribution center beginning in February or March of 1999.  Ward's first occasion in which he was required to lift a trailer door occurred in March, 1999.[4]  Believing the door would roll up easily, he attempted to open the door and discovered that it was spring-loaded, an effort that caused severe pain in his shoulders.  Ward testifies that, on the next few occasions he was required to open the truck doors, he requested assistance from either the truck driver or a co-worker who would lift the trailer door for him.  However, on April 2, 1999, Ward asked a truck driver to open the door and was refused, in spite of the fact that Ward informed the driver of his overhead lifting restriction.  The incident was reported to management personnel.

On April 3, Ward provided Oscar Bustamante, Wal-Mart's Loss Prevention Manager for the distribution center, with a letter and medical reports documenting his physical impairment.  In his letter, he suggested that Wal-Mart issue a memo stating that it was the responsibility of the

---

[4]The evidence demonstrates that loss prevention officers are only required to check truck contents, and accordingly to lift the trailer doors, on specific occasions.  Trucks coming into and going out of the distribution center are of two kinds:  general over-the-road (OTR) trucks driven by independent trucking companies and "Merit" trucks which are controlled solely by Wal-Mart and carry only Wal-Mart products.  The truck gate duty of a loss prevention officer consists primarily of writing information about the truck and its contents, stamping the purchase order the driver is carrying, and visually inspecting the seals on the outside of the truck.  The only trucks which require a loss prevention officer to lift the truck door are incoming Merit trucks which the drivers' records indicate are empty.  Loss prevention officers are not required to open the backs of outgoing Merit trucks, incoming Merit trucks that contain product, or either outgoing or incoming OTR trucks.

truck drivers to open their own trailer doors.  Mr. Bustamante issued an interoffice memo to all

loss prevention officers on April 6 in which he stated, in relevant part:  "Effective immediately, we

will not be opening the back door of any Merit/OTR trailers.  It is the responsibility of the driver

to open the door for your inspection.  NO EXCEPTIONS."  Defendant's Exhibit N.  On May 4,

Mr. Bustamante issued a second memo rescinding this policy, which Ward maintains he did not

see until May 6, the day of his termination.  The second memo states:

> Starting tomorrow, we will now open the trailer doors again.  It was a legal issue
> that has been taken care of.  If you can get "any" [sic] driver to open the door for
> you GREAT!!  But any Wal-Mart or Merit trailers coming in, we need to open the
> trailer door for them.  STANDARD POLICY THROUGHOUT WAL-MART
> DISTRIBUTION CENTERS.

Defendant's Exhibit O.

Unrelated to Mr. Ward's physical impairment, on or about March 12, 1999, Ward filed  a

charge of discrimination with the Equal Employment Opportunity Commission (EEOC) under the

Age Discrimination in Employment Act.  The bases for Mr. Ward's charge are not relevant to the

present case, as Ward has chosen not to pursue his age discrimination claim.  The filing of the

charge with the EEOC is, however, the foundation for his retaliation claim under the ADEA.

On May 6, 1999, Wal-Mart terminated Ward's employment.  The reason for Ward's

termination, as acknowledged by Wal-Mart and stated on Ward's exit interview document

(Defendant's Exhibit E), was his failure to perform an essential job function:  namely, his inability

to roll up the trailer doors.  Ward claims that he was terminated as a result of his disability in

violation of the ADA.  In addition, Ward alleges that he was unjustly terminated in retaliation for

filing a charge under the ADEA.

Following Mr. Ward's termination, he filed a charge with the EEOC alleging discrimination under the ADA. Ward subsequently applied for and received an award of unemployment compensation from the New Mexico Department of Labor, which Wal-Mart appealed. Leonidus Holbrook, General Manager of the distribution center, made the decision to appeal Ward's unemployment compensation award: according to Mr. Holbrook's testimony, Wal-Mart's policy at the time was to appeal all grants of unemployment compensation. Under New Mexico law, the only legitimate reason for denying unemployment compensation benefits to a discharged employee is termination for misconduct. See NMSA § 51-1-7(B) (Michie 1978 & Repl. Pamp. 2000). Ward claims that, because he was not discharged due to misconduct, Wal-Mart had no justifiable grounds for appeal. Accordingly, Ward also brings a claim for retaliation under the ADA on the ground that Wal-Mart's appeal of his unemployment compensation award was brought solely to harass him for filing his ADA discrimination charge. Defendant Wal-Mart has moved for summary judgment on each of Ward's claims.

## II.
## DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When applying this standard, a court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Simms

v. Oklahoma ex. rel. Dep't of Mental Health & Substance Abuse Serv., 165 F.3d 1321, 1326

(10th Cir. 1999).  A mere scintilla of evidence supporting the nonmoving party's theory

does not create a genuine issue of material fact.  Anderson v. Coors Brewing Co., 181 F.3d 1171,

1175 (10th Cir. 1999).  Instead, the nonmoving party must present facts such that a reasonable

jury could find in its favor.  Id.

**B.      Americans with Disabilities Act**

In order to establish a claim under the ADA, Ward must demonstrate:  1) that he is a

disabled person within the meaning of the ADA; 2) that he is qualified, i.e., able to perform the

essential functions of his job with or without reasonable accommodation (which he must

describe); and 3) that Wal-Mart terminated him because of his disability.  Sutton v. United Air

Lines, Inc., 130 F.3d 893, 897 (10th Cir. 1997); White v. York Int'l Corp., 45 F.3d 357, 360-61

(10th Cir. 1995).  Wal-Mart contends that it is entitled to summary judgment because Ward is

neither "disabled" nor "qualified" within the meaning of the ADA.

**1.      "Disability" Under the ADA**

The ADA defines a disability as "(A) a physical or mental impairment that substantially

limits one or more of the major life activities of such individual; (B) a record of such an

impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).  Here,

Ward claims that he is disabled because the physical impairment in his shoulders substantially

limits his major life activity of lifting.  The Tenth Circuit has determined that lifting falls within the

definition of a major life activity.  Rusk v. Ryder Integrated Logistics, 238 F.3d 1237, 1240 (10th

Cir. 2001); Lowe v. Angelo's Italian Foods, Inc. 87 F.3d 1170, 1172-73 (10th Cir. 1996).

Therefore, the question is whether Ward's impairment "substantially limits" his ability to lift.  See Rusk, 238 F.3d at 1240.

An impairment substantially limits a major life activity if the individual 1) is unable to perform a major life activity that the average person in the general population can perform; or 2) is significantly restricted as to the condition, manner or duration under which he can perform a particular life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.  29 C.F.R. § 1630.2(j)(1).  A court must consider three factors in determining whether an impairment substantially limits a major life activity:  1) the nature and severity of the impairment; 2) the duration or expected duration of the impairment; and 3) the permanent or long term impact resulting from the impairment.  Id. § 1630.2(j)(2); see also Rusk, 238 F.3d at 1240.

Wal-Mart contends that Ward has not demonstrated he is significantly restricted as to his lifting ability because he has not presented evidence comparing his lifting ability to the capabilities of an average person in the general population.  However, as the Tenth Circuit recently affirmed in Rusk, supra, "comparative evidence is not required as a matter of law to withstand a motion for summary judgment where the impairment appears substantially limiting on its face."  238 F.3d at 1240 (citing Lowe, 87 F.3d at 1174).  The court held in Lowe that an impairment restricting the plaintiff from lifting in excess of fifteen pounds was substantially limiting on its face, and thus the plaintiff created a genuine issue of material fact with respect to whether her impairment substantially limited the life activity of lifting.  87 F.3d at 1174.  Correspondingly, the Rusk court found a forty pound lifting requirement *not* to be substantially limiting on its face:  therefore, in order to survive summary judgment, a plaintiff with such a restriction is required to produce

-8-

comparative evidence from which a reasonable inference can be drawn that the restriction substantially limits the plaintiff's lifting ability.  Rusk, 238 F.3d at 1240-41.  See also EEOC v. United Airlines, 1999 WL 397390 (10th Cir. June 17, 1999) (evidence of plaintiff's twenty pound lifting restriction, coupled with evidence that plaintiff was unable to perform everyday tasks such as vacuuming, cleaning, and carrying groceries, sufficient to withstand summary judgment); Gibbs v. St. Anthony Hospital, 1997 WL 57156 (10th Cir. Feb. 12, 1997) (plaintiff's twenty-five pound repetitive lifting restriction and thirty-five pound occasional lifting restriction insufficient to withstand summary judgment).

Here, Ward's impairment permanently restricts him both from reaching overhead on a repetitive basis and from lifting any object greater than two pounds over his head.  The Court concludes that this impairment is substantially limiting on its face.  Ward's overhead lifting restriction is, for all intents and purposes, absolute:  comparative evidence is unnecessary to establish that Ward is significantly restricted in his ability to lift as compared to the average person in the general population.  Thus, Ward has created a genuine issue of material fact as to whether his impairment substantially limits his ability to lift.

### 2.   "Qualified Person" Under the ADA

Wal-Mart argues that, even if Ward has established he is disabled within the meaning of the ADA, he has failed to demonstrate that he is "qualified" for the position of loss prevention officer.  The Tenth Circuit has developed a two-part analysis for determining whether a disabled individual is qualified under the ADA:

> First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue.  Second, if (but only if) we conclude that the individual is not able

-9-

> to perform the essential functions of the job, we must determine whether any
> reasonable accommodation by the employer would enable him to perform those
> functions.

White, 45 F.3d at 361-62 (quoting Chandler v. City of Dallas, 2 F.3d 1385, 1393-94 (5th Cir.

1993)); see also Lowe, 87 F.3d at 1174.  The case at bar concerns Ward's inability to perform

only one job function, namely, opening the trailer doors on outgoing trucks.  Ward contends that

opening the trailer doors is not an essential function of the job of loss prevention officer, and, in

the alternative, that Wal-Mart failed to provide him with a reasonable accommodation that would

enable him to perform that function.  Because the Court agrees that lifting the trailer doors is non-

essential to Ward's position, we do not now reach the question of reasonable accommodation.[5]

The term "essential functions" is defined as "the fundamental job duties of the employment

position the individual with a disability holds or desires."  29 C.F.R. § 1630.2(n)(1); Martin v.

Kansas, 190 F.3d 1120, 1130 (10th Cir. 1999).  This term does not include marginal functions of

the position.  29 C.F.R. § 1630.2(n)(1); White, 45 F.3d at 361.  The ADA provides that, in

determining what functions of a job are essential, "consideration shall be given to the employer's

judgment..., and if an employer has prepared a written description before advertising or

interviewing applicants for the job, this description shall be considered evidence of the essential

functions of the job."  42 U.S.C. § 12111(8).  Under ADA regulations, a job function may be

considered essential for any of several reasons, including but not limited to the following:

---

[5]It is often difficult to distinguish those ADA cases in which an employee claims that a
particular job requirement is not essential for satisfactory job performance from those in which an
employee seeks a reasonable accommodation on the part of an employer.  Analytically, the two
scenarios may differ.  As a practical matter, however, in either case "the plaintiff will have the
burden of establishing that he or she is otherwise qualified to perform the essential functions of
the job, absent the challenged job criteria or with the proposed reasonable accommodation."
Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, n.8 (6th Cir. 1996).

(i)   The function may be essential because the reason the position exists is to perform that function;

(ii)  The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2); <u>Martin</u>, 190 F.3d at 1130.  In addition to the employer's judgment and written job descriptions, evidence of whether a particular function is essential includes, in relevant part, "the amount of time spent on the job performing the function" and "the consequences of not requiring the incumbent to perform the function."  29 C.F.R. § 1630.2(n)(3); 190 F.3d at 1130.

Applying these factors to the present case, the Court finds that, at a minimum, Ward has raised a genuine issue of material fact as to whether lifting the trailer doors is an essential function of the job of loss prevention officer at a Wal-Mart distribution center.  While it appears from the evidence that loss prevention officers must have the ability to verify the contents, or lack thereof, of incoming trucks, the ability to open the doors on those trucks is peripheral.  This is corroborated by the testimony of Mr. Bustamante, the Loss Prevention Manager for the distribution center, who acknowledged that there was no policy requiring the loss prevention officers to open the trailer doors.  <u>See</u> Plaintiff's Exhibit 4 at 53-54.  Rather, Mr. Bustamante described the function as "a courtesy" to Wal-Mart's third-party carriers, and noted that truck drivers would ordinarily open their own trailer doors for female loss prevention officers.  <u>Id</u>.  Importantly, the amount of time devoted to truck inspection appears to be minimal.  "Truck-gate duty" comprises only a third of the job of loss prevention officer, and of that duty, an officer is required to lift the door only on those incoming Merit trucks which the drivers' records indicate

are empty.  See n.4, supra.  The EEOC officer who investigated Ward's claim observed the truck

gate duty in August, 2000 and reported that at no time did the loss prevention officers open the

trailer doors on delivery trucks entering or leaving the facility.  See Plaintiff's Exhibit 6.

Wal-Mart points to the potentially serious consequences of "not requiring the incumbent

to perform the function" of opening the trailer doors.  See 29 C.F.R. § 1630.2(n)(3)(iv).  At

times, only one loss prevention associate is assigned to the truck gate area.  Wal-Mart suggests

that, were Mr. Ward the only officer at the truck gate, trucks would be passed over for inspection

due to his inability to raise the trailer doors.  However, at least two people are always present

upon product delivery:  the loss prevention officer and the truck's driver.  Wal-Mart has not

explained why the truck drivers were unable to open their own trailer doors for Ward short of

Ward's testimony that the truck drivers "were just unwilling to do that."  The reasonableness of

driver assistance is supported by the memo issued by Mr. Bustamante requiring truck drivers to

open their own doors.  Although Wal-Mart now claims this policy was "not reasonable" the

reason for the policy's rescission is not clear from Mr. Bustamante's May 4, 1999 memorandum.[6]


Most significant is the Matrix of Essential Job Functions provided to Ward on the day of

his interview.  Both the ADA and its implementing regulations instruct that an employer's written

description of a position, prepared before advertising or interviewing applicants for the job, shall

be considered evidence of the job's essential functions.  See 42 U.S.C. § 12111(8); 29 C.F.R. §

---

[6]The memorandum states simply that requiring truck drivers to open their own trailer
doors "was a legal issue that has been taken care of."  Wal-Mart has not expanded on its reasons
for altering the policy, and the Court is not able to conclude from the memorandum that, as Wal-
Mart contends, requiring truck drivers to open the trailers was "unreasonable."

1630.2(n)(3)(ii).  The matrix, as described above, sets forth the "essential functions" of each entry-level position at Wal-Mart distribution centers specifically for the purpose of "advis[ing] applicants who have disabilities of the essential functions as defined by the [ADA]."  Upper body mobility is not marked as an essential function for the position of loss prevention officer.  Lifting the gates on the back of outgoing trailers, which necessitates raising a spring-loaded door above one's head, is clearly an exercise that requires upper body mobility.  While it is true, as Wal-Mart asserts, that consideration shall be given to an employer's judgment regarding essential job functions, it is disingenuous for Wal-Mart's managers to now claim, in contravention of the company's own written statement, that lifting the trailer doors is an essential function of Mr. Ward's job.[7]

---

[7]Wal-Mart suggests that Ward's failure to note his shoulder impairment on the bottom of his essential job functions form is evidence of his lack of candor with respect to his disability.  At the bottom of the form is the following statement:  "Wal-Mart recognizes that an individual with a disability may require an accommodation to enable them to successfully perform a job function. Should you require such an accommodation, please complete the section below.  Consideration will be given to all suggested reasonable accommodations."  See Attachment A to Plaintiff's Exhibit 1.  Underneath this statement are spaces for the employee to list information regarding the essential function in question, the employee's limitation, and suggested accommodations.  Id. These spaces are left blank on Ward's form.  Contrary to Wal-Mart's assertion, it is predictable that Ward would not list a limitation for the essential function of upper body mobility when the matrix states that upper body mobility is not required for the position of loss prevention officer. The evidence demonstrates that, as Ward attested on the form, he "has the ability to perform all of the [essential functions highlighted on the matrix]."  Nor is the Court impressed by Wal-Mart's argument that its matrix is "not legally binding" and "is used merely as a guide."  It is difficult to imagine a more effective written job description for purposes of analysis under the ADA than one explicitly designed "to advise applicants who have disabilities of the essential functions as defined by the [ADA]."  No doubt, were upper body mobility listed as an essential function of the job of loss prevention officer, Wal-Mart would not hesitate to introduce the matrix in support of its argument.  Moreover, were this a material issue, there would be a fact dispute as to Wal-Mart's knowledge as Ward filed an affidavit stating he informed the company's interviewer of his lifting limitations.

Because Ward's inability to open the trailer doors is the only job function at issue, he has sufficiently demonstrated that he is qualified to perform the essential functions of his job in spite of his disability.  Summary judgment on this ground is therefore inappropriate.  <u>Riel v. Electronic Data Sys. Corp.</u>, 99 F.3d 678, 683 (5th Cir. 1996).  Defendant's motion for summary judgment on Plaintiff's ADA claim is denied.

**C.     Retaliation Claims**

Ward brings claims for retaliation under both the Age Discrimination in Employment Act (ADEA) and the ADA.  First, Ward alleges that Wal-Mart terminated his employment for having filed a claim for discrimination under the ADEA.  Second, Ward contends that Wal-Mart's appeal of his unemployment compensation award was brought in order to harass him for having filed his ADA charges.

Retaliation charges are analyzed under the familiar burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973).  <u>Anderson v. Coors Brewing Co.</u>, 181 F.3d 1171, 1178 (10th Cir. 1999) (citing <u>Morgan v. Hilti, Inc.</u>, 108 F.3d 1319, 1323 (10th Cir. 1997)). Under that framework, a plaintiff must first establish a prima facie case of retaliation.  <u>Anderson</u>, 181 F.3d at 1178 (internal citations omitted).  If the plaintiff establishes this prima facie case, the burden shifts to the defendant to present a nondiscriminatory reason for its employment action.  <u>Id</u>.  If the employer presents such a nondiscriminatory reason, the burden shifts back to the plaintiff to show that "there is a genuine issue of material fact as to whether the employer's proffered reason for the challenged action is pretextual, i.e., unworthy of belief."  <u>Id</u>.

In order to establish a prima facie case of retaliation under either statute, Ward must show 1) protected employee action; 2) adverse action by an employer either after or contemporaneous

-14-

with the employee's protected action; and 3) a causal connection between the employee's action and the employer's adverse action. <u>Anderson</u>, 181 F.3d at 1178 (citing <u>Morgan</u>, 108 F.3d at 1324).

### 1.    ADEA

For the purposes of its motion for summary judgment, Wal-Mart concedes that Ward has met the first two prongs of his prima facie case for retaliation under the ADEA: i.e., that he engaged in a protected activity by filing a charge of age discrimination with the EEOC, and that his termination constituted an adverse employment action. The Court's analysis must therefore begin with whether Ward has made a sufficient showing of causation between his EEOC charge and his termination.

Ward's charge of age discrimination was filed with the EEOC on or about March 12, 1999, and mailed to Wal-Mart on March 16. Ward was terminated on May 6, less than two months later. The Tenth Circuit has established that "a retaliatory motive may be inferred when an adverse action closely follows protected activity." <u>Anderson</u>, 181 F.3d at 1179 (quoting <u>Chavez v. City of Arvada</u>, 88 F.3d 861, 866 (10th Cir. 1996)). However, "unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." 181 F.3d at 1179 (quoting <u>Conner v. Schnuck Markets, Inc.</u>, 121 F.3d 1390, 1395 (10th Cir. 1997)). In the present case, Ward's prima facie case rests entirely on the proximity of his protected activity to his termination. The Tenth Circuit has held that evidence of a one and one-half month period between the protected activity and the adverse employment action is sufficient, by itself, to establish an inference of causation. <u>Ramirez v. Oklahoma Dept. of Mental Health</u>, 41 F.3d 584, 596 (10th Cir. 1996). In

contrast, a three-month period, by itself, is insufficient to establish a causal connection. Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997). In the present case, Ward's termination occurred about eight weeks after he filed his charge with the EEOC. Presumably, this time frame is sufficient in itself to establish an inference of a retaliatory motive. The Court need not decide this issue conclusively, however, because Ward has not demonstrated that Wal-Mart's proffered reason for his termination was pretextual. See Anderson, 181 F.3d at 1179.

Assuming Ward has established his prima facie case of retaliation, the burden shifts to Wal-Mart to present a legitimate, nondiscriminatory reason for its employment action. Wal-Mart's proffered reason for Ward's termination, which Ward does not contest, is his inability to perform an essential function of his job: specifically, rolling up the trailer doors. Ward makes no attempt to introduce evidence beyond his prima facie case that this reason for his termination is pretextual. Rather, he argues that, because he was terminated as a result of his disability, his termination was an act of discrimination and Wal-Mart has therefore failed to meet its burden of articulating a legitimate, "nondiscriminatory" reason for its action. In other words, Ward contends that Wal-Mart must do more than proffer a reason other than retaliation for its decision to terminate him: Wal-Mart's explanation must be devoid of any form of prohibited discrimination.

Wal-Mart's burden is not so high. Once Ward has established his prima facie case, Wal-Mart need only present a *nonretaliatory* reason for his termination; the burden then shifts back to Ward to show that retaliation was a substantial or motivating factor in Wal-Mart's employment decision. See Mason v. Oklahoma Turnpike Auth., 115 F.3d 1442, 1455 (10th Cir. 1997); see also Lyford v. Schilling, 750 F.2d 1341 (5th Cir. 1985) (where plaintiff claimed that she was not

-16-

hired because of her sex, employer's assertion that plaintiff was not hired as a result of her national origin was sufficient to rebut plaintiff's prima facie case of sex discrimination).  Here, Wal-Mart has asserted that its decision to terminate Ward was based not on retaliation, but on Ward's failure to perform an essential function of his job.  Inability to perform an essential job function is a legitimate, nondiscriminatory reason for an employee's termination.  See Anderson, 181 F.3d at 1180.  As discussed above in the context of Ward's ADA claim, questions of fact exist regarding Ward's inability to perform his essential job functions:  specifically, Wal-Mart has not sufficiently demonstrated that raising the trailer gates on incoming trucks is an essential function of the job of loss prevention officer.  However, in the context of the McDonnell Douglas burden-shifting analysis, "it is sufficient if the defendant's evidence raises a genuine issue of material fact as to whether it discriminated against the plaintiff."  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  This Court is not in the position of deciding whether Wal-Mart's business decision was good or bad.  Sanchez v. Phillip Morris, Inc., 992 F.2d 244, 247 (10th Cir. 1993).  The provision against retaliation "is not violated by the exercise of erroneous or even illogical business judgment.  An employer's business judgment is relevant only insofar as it relates to the motivation of the employer with respect to the allegedly illegal conduct."  Id.

Once a defendant meets its burden of producing a nonretaliatory reason for the plaintiff's termination, the presumption of discrimination raised by the plaintiff's prima facie case "drops from the case" and the plaintiff must provide additional evidence that the discharge was taken in retaliation for the protected employment activity.  Connor v. Schnuck Markets, Inc., 121 F.3d 1390, 1396 (10th Cir. 1997) (citing Burdine, 450 U.S. at 255 and n.10).  Because Ward has

offered no evidence of retaliation beyond his prima facie case, he has failed to make a showing that Wal-Mart's proffered reason for his termination is pretextual.  Wal-Mart's motion for summary judgment on Plaintiff's claim for retaliation under the ADEA is therefore granted.

2.      ADA

The Court turns next to Ward's ADA retaliation claim.  Following his termination, on or about May 17, 1999, Ward filed his complaint with the EEOC alleging discrimination under the ADA.  Ward also applied for and received an award of unemployment compensation.  On June 10, Wal-Mart filed an appeal of Ward's unemployment compensation award, which was ultimately denied; while the appeal was pending, Ward's benefits were stayed and he was forced to miss several bill payments.  Ward contends that Wal-Mart's appeal was frivolous and brought in retaliation for filing his EEOC charge.  Wal-Mart urges in response that Ward has failed to establish a prima facie case of retaliation under the ADA because its decision to appeal Ward's award of unemployment compensation does not constitute "adverse employment action."  See Anderson, 181 F.3d at 1178.

Initially, Wal-Mart argues that an employee may not bring a claim for retaliation based, as here, on a charge of discrimination filed after the employee's termination.[8]  To the contrary, the Supreme Court holding in Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997), establishes that a former employee may bring an action against a former employer for retaliatory post-employment

_____

[8]Wal-Mart bases its argument on an incorrect reading of Anderson v. Coors Brewing Co., 181 F.3d 1171, n.2 (10th Cir. 1999).  The footnote in Anderson merely reaffirms the well-established, common-sense principle that, in order for an employee to establish a prima facie case of retaliation, the employee must show that the adverse action taken by the employer was subsequent to or contemporaneous with the employee's protected action.  See Morgan v. Hilti, 108 F.3d at 1324.

actions.  See also Trujillo v. Univ. of Colorado Health Sciences Ctr., 157 F.3d 1211, 1215 (10th

Cir. 1998); Drake v. Colorado State Univ., 1998 WL 614474 (10th Cir. September 8, 1998).

Ward has sufficiently shown that Wal-Mart's allegedly retaliatory action--the appeal of Ward's

unemployment compensation award--was taken subsequent to Ward's filing of his ADA

discrimination charge with the EEOC.

 The Court finds that Ward has established a prima facie case of retaliation.  The first and

third prongs are easily satisfied.  Ward's filing of an EEOC claim undisputably constitutes a

protected action.  See Anderson, 181 F.3d at 1178.  Because Wal-Mart filed its appeal less than a

month after Ward's protected action, the temporal proximity of the two actions raises the

inference of a retaliatory motive sufficient to establish a causal connection.  See Ramirez, 41 F.3d

at 596.

 With respect to the second prong of Ward's prima facie case the Court holds that, if Wal-

Mart's appeal of Ward's unemployment compensation award is found to be frivolous, Wal-Mart

has subjected Ward to an adverse employment action.  The Tenth Circuit has not adopted a set

rule regarding what constitutes an "adverse employment action":  rather, this determination is to

be made on a case-by-case basis, examining the unique factors relevant to the situation at hand.

Anderson, 181 F.3d at 1178; Sanchez v. Denver Public Schools, 164 F.3d 527, 532 (10th Cir.

1998); see also Davis v. Guardian Life Ins. Co. of America, 10 AD Cases 316, 2000 WL 122357

(E.D. Pa. Feb. 1, 2000) (depriving employee of disability benefits for eight months after she filed

EEOC charge created a fact question regarding adverse employment action, despite fact that

benefits were later reinstated).  In making such a determination, a court should consider whether

the threat of the employer's action would deter victims of discrimination from complaining to the

EEOC.  See Robinson, 519 U.S. at 346.  As recently stated by one district court:  "It is certainly

true that 'a lawsuit...may be used by an employer as a powerful instrument of coercion or

retaliation' and that such suits can create a 'chilling effect' on the pursuit of a discrimination

claim."  EEOC v. Outback Steakhouse of Florida, Inc., 75 F.Supp.2d 756, 758 (N.D. Ohio 1999)

(quoting Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 740-41 (1983)).

Correspondingly, a number of courts have held that "the filing of lawsuits, not in good faith and

instead motivated by retaliation, can be the basis for [an unlawful retaliation claim]."  Outback

Steakhouse, 75 F.Supp.2d at 758 (N.D. Ohio 1999) (quoting Harmar v. United Airlines, Inc.,

1996 WL 199734 (N.D. Ill. April 23, 1996); see also EEOC v. Virginia Carolina Veneer Corp.,

495 F.Supp.775, 778 (W.D. Va. 1980) (employer's filing of state court defamation action based

on employee's Title VII claim "unquestionably retaliatory" in nature).  But cf. EEOC v. R.J.

Gallagher Co., 181 F.3d 645, 657 (5th Cir. 1999) (filing of lawsuit does not constitute an adverse

employment action when lawsuit is factual and legally well-founded).  The Court agrees that the

filing of frivolous lawsuits may constitute an adverse employment action for purposes of a

retaliation claim.  This holding is consistent with one of the primary purposes of antiretaliation

provisions:  "[m]aintaining unfettered access to statutory remedial mechanisms."  Robinson, 519

U.S. at 346.  Public policy strongly dictates against allowing employers to bring groundless

litigation in retaliation for an employee's exercise of protected rights.

     The burden now shifts to Wal-Mart, who asserts that its appeal of Ward's unemployment

compensation award was nonretaliatory because the company's policy at the time was to appeal

all unemployment compensation awards as a matter of course.  The Court finds that Ward has

raised a genuine issue of fact as to whether Wal-Mart's explanation is pretextual.  "Pretext can be

shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." <u>Morgan</u>, 108 F.3d at 1319 (citations omitted).  New Mexico law is clear that the only legitimate reason for denying unemployment compensation benefits to a terminated employee is discharge for wrongful conduct.  NMSA § 51-1-7(B); <u>see also</u> <u>Chicharello v. Employment Sec. Div., New Mexico Dept. of Labor</u>, 122 N.M. 635, 637 (N.M. 1996).  Wal-Mart has acknowledged that the only reason for Ward's termination was his inability to perform an essential job function.  Because Wal-Mart had no legitimate basis for appeal, a reasonable factfinder could find the company's proffered explanation to be unworthy of credence.  Accordingly, Wal-Mart's motion for summary judgment with respect to Plaintiff's claim for retaliation under the ADA is denied.

### III.
### CONCLUSION

For the reasons set forth above, the Court hereby GRANTS Defendant's motion for summary judgment with respect to Plaintiff's claim for retaliation under the Age Discrimination in Employment Act.  The Court DENIES Defendant's motion for summary judgment on Plaintiff's claims for discrimination and retaliation under the Americans With Disabilities Act.

IT IS SO ORDERED.

Dated at Albuquerque this 19th day of April, 2001.


                                  BRUCE D. BLACK
                                  United States District Judge


**ATTORNEYS:**

For Plaintiff:
        Mary G. Wilson, Esq., Albuquerque, NM

For Defendant:
        Cindy J. Lovato-Farmer, Esq., Albuquerque, NM
        Carlos M. Quiñones, Esq., Bentonville, AR